## ELWELL v. TUCKER.

(Circuit Court of Appeals, Third Circuit. May 22, 1919. Rehearing Denied June 24, 1919.)

### No. 2450.

SHIPPING ⊘〰54—SINKING OF BARGE NOT CHARGEABLE TO CHARTERER'S NEGLI-GENCE.

Evidence *held* not to sustain allegations of a libel that the swinging around of one end of a barge, after it had grounded at night while being moved to a new position at a wharf, which caused such end to settle on a stone pile when the tide fell, was due to fault of the charterer, who directed the movement until the grounding, and then left the barge in a safe position, from which it was moved by the master.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in admiralty by Bernard Tucker, owner of the barge Defender, against Samuel P. Elwell. Decree for libelant, and respondent appeals. Reversed and remanded, with directions.

For opinion below, see 252 Fed. 874.

W. M. Harris, of Philadelphia, Pa., for appellant.

George P. Rich, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the sinking of the coal barge Defender. From the proofs it appears that on October 29, 1917, Tucker, the plaintiff and owner of said barge, entered into a verbal contract with Elwell, the defendant, to carry on said barge, from Philadelphia, 197 tons of Elwell's coal to Pennsville, Pa. Elwell was to load and discharge the coal.

In pursuance of this contract, the barge and coal were towed to Pennsville and there delivered at a wharf designated by Elwell, where the barge remained under charge of her master, awaiting discharge by Elwell. Such discharge Elwell had to make at another part of the wharf, where there was a derrick, which was then being used to discharge another cargo of Elwell's coal from a barge lying at that point. The latter barge being thereafter discharged, Elwell directed the captain of the Defender to shift his barge from her original mooring to one near the derrick. In doing so the barge grounded, sank, and was strained and broken. Alleging such injury was caused by the fault of Elwell in misdirecting the captain, Tucker, the owner of the barge, filed this libel in personam against Elwell. The case was heard on libel, answer, and proofs, and resulted in the court below holding Elwell in fault. From such finding, and a decree so adjudging, Elwell took this appeal.

No principles or questions of law are involved. The sole issue is one of fact, namely, whether the proofs show the damage done to the barge was caused by the fault of Elwell. As the court below found

⊘〰For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

him at fault, and we have reached the contrary conclusion, we deem it proper to discuss the proofs at length, and thus place of record the reasons which lead us to such different conclusion.

Of the general features of the case there is no dispute, and they are as above stated. The case centers on what transpired in the few minutes during which the barge was being moved from her moorings under Elwell's direction. As the captain of the barge was wholly ignorant of the water at the wharf, and as Elwell was familiar with same, as the moving was done at night, and Elwell was present and in charge, there is no question of the fact that Elwell undertook, and of the duty thereby imposed on him, to give proper directions, and of the bargemaster's duty to follow them. Nor is there, under the testimony, any doubt of Elwell's capacity to give proper directions, or the fact that the line from where the barge was moved, to the derrick, was a safe path to follow. As to Elwell's knowledge of the water and the bottom, the proof is:

"Q. You said you had been using that wharf how long? A. Oh, for 20 years. Q. Have you ever had any trouble with barges grounding or sustaining damages in that particular place? A. Never had a particle of trouble there; never."

There is also no question but that, if the barge had been kept on the direct course between her mooring place and the derrick, the bottom was such that the Defender, which was built for laying on a smooth bottom between tides, would have suffered no harm. In point of fact, what happened was that, while she was being pulled across on this course, her forward end (which was the stern end of the barge section) grounded, and if she had remained on that course no harm would have resulted. But, in point of fact, her other end, which was of lighter draft, was swung around toward the wharf, and it also grounded; but as this latter grounding was not on a smooth bottom, but upon a projection, the barge was twisted and damaged when the tide fell. The case turned on the question whether this swing of the rear or hinge end of the barge in toward the wharf and over this hump, stone pile, or projection of some kind, came about through Elwell's directions.

The wharf in question projected about 250 feet into the Delaware river, and from its outer end a projection extended up the river, at right angles, about 50 feet. It was along the north side of this projection the Defender was moored, and lay until the night of the accident. On the north side of the wharf, some considerable distance from this projection and nearer shore, was the unloading derrick, where Elwell desired the Defender to be taken. Alongside the derrick Elwell had another barge, of which one Boyer was captain, unloading. On the night in question, Elwell went down to Boyer's barge between 11 and 12 o'clock, when the tide was about full, called Boyer out of his cabin, and helped him move his barge away from the derrick, so as to make room for the Defender. Having moved Boyer's barge, Elwell went and called Andrews, the captain of the Defender, to move his boat over to the derrick. At this point we note that Andrews was a Portugese, that his knowledge of English was so limited

that he testified in this case through an interpreter, a fact that gives weight to the suggestion that he may very readily have misunderstood what Elwell, from time to time, said to him. We note, also, that we start with two fundamental facts, namely, that Elwell's object in moving the Defender was, first, to take her straight over to the derrick; and, second, that he had no possible object in swinging her from that course into the position in which she was found lying the next morning.

Elwell's account is that, having helped Boyer move his barge from her place at the derrick, he called Andrews, the captain of the Defender, who threw him a line from the forward (stern) end, which Elwell made fast near the derrick. Although Elwell and Andrews differ as to which one pulled the barge forward, Elwell saying he made the line fast to the wharf and Andrews pulled, while Andrews says he made the line fast and Elwell pulled, yet, whoever did the pulling, there is no doubt that the barge was pulled ahead in the direction of the derrick until the forward (stern) end grounded. Now the uncontradicted proof is that the stern (hinge) end of the barge was drawing less water than the forward (stern) end. Consequently, while the barge was being pulled toward the derrick, it is clear the lighter draft end of the barge could not ground on bottom which the deeper draft end had passed over. This position of the barge, viz. grounded at the forward (stern) end, is the position which Elwell alleges the barge was in when he went home and left it. In that regard he testified:

"After this boat fetched up there, I saw there was going to be no tide, the wind was northwest, and I said: 'Captain, you are all right where you are. I am going home.'"

Elwell says that when he saw the sunken barge the next morning the forward (stern) end was in the same position he left her, but the stern (hinge) end had been pulled in. In that respect he testified:

"I do not think the stern had moved from where she was when I left that night, but the hinge end had been pulled in. * * * Q. Then it was the next morning, following that, that you found her swung around, with the hinge end pointing towards the corner of the dock? A. That is it exactly. Q. Aground at both ends; all aground? A. All aground."

Such is Elwell's account of the grounding of the barge, of leaving her in a safe position, and of finding her in a different position the next morning. In this he is corroborated by Boyer, the captain of the barge Madeline. Boyer says that Elwell came down about high water on that night and helped him move the Madeline away from the derrick. After this was done, he says he was standing at the offset of the wharf, and the Defender was lying where she had been all day, when her captain asked Elwell to take the stern line. Elwell did so, and fastened the line about half way between the angle and the derrick, and the captain pulled the boat in toward the derrick, and continued to do so until he was "about 10 feet from my stern. He fetched up 10 feet from my stern." Boyer's account is:

"Q. I understood you to say that he pulled straight ahead. Is that right? A. Straight ahead. Q. When you say 'he pulled,' who do you mean? Do you mean the master of the barge? A. The master of the barge. * * * Q.

The master was on the end of the barge, the stern of the barge, pulling? A. Yes. Q. Then you say he pulled a certain distance when his stern grounded? A. Yes, sir. Q. What did Mr. Elwell say then? A. He said: 'We will have to leave it lay where she is. There will not be enough water to move it in.' * * * Q. Then Mr. Elwell went home? A. Yes, sir. Q. After Mr. Elwell left this place, what took place right after that? What took place after Mr. Elwell left the wharf? A. About half an hour afterwards he heaved the hinge in. Q. Who heaved the hinge in? A. The master. Q. The master of the barge? A. Yes. * * * Q. You say he pulled the hinge in. Where did he pull it to? A. He pulled it into this notch. Q. When you saw him pulling the hinge into the notch, what, if anything, did you say to him? A. I told him there was a little hump there. * * * Q. With what process did he pull it in? With a capstan? A. With a capstan. * * * Q. You say he pulled it in 10 feet? A. No; after he had got done pulling, he fetched up about 10 feet from the wharf. Q. When you say 'wharf,' what part of the wharf do you mean? A. Inside the offset. * * * Q. And his bow or his hinge end was up in the offset? Is that where you mean? A. Yes; up in the corner. Q. When he had gotten himself in that position, what did you tell him, or did you tell him anything at all? A. I told him there was a lump there. Q. When he found he was caught, what did he do? A. He did not make an attempt to do anything. * * * Q. If the barge had remained there where she was, when he stopped pulling ahead, would he have laid safely that night? A. Yes; he would have laid safe, no matter where he laid, because I have laid all around there."

It will thus be seen that Elwell's account of how he left the barge in a safe position is corroborated by an apparently disinterested witness; but we have from that same witness an account of how the stern (hinge) end of the barge was swung around into the dangerous position, which caused her injury. Bearing on this fact it will be noted that the captain of the Defender admits he pulled that end of the barge in toward the wharf, that he did it without any orders given him, that he did not know the character of the water, and that he grounded the end of the boat he was pulling in. It is claimed, however, that this pulling in by Andrews toward the wharf took place, not, as Boyer says, after Elwell left, but while Elwell was pulling the barge ahead toward the derrick with the line at the other end. In these regards the testimony of Andrews is:

"Q. Where did Elwell stand? A. He was toward the derrick, up toward the derrick. Q. He was up near the derrick, was he? A. Yes, sir. Q. Then, when Elwell got the line, he walked up towards the derrick; is that right? A. Yes, sir. Q. That is right? A. Yes, sir. Q. And he was pulling up toward the derrick, and you were pulling in toward the wharf? Is that right? A. Yes, sir. * * * Q. At the time you started pulling in there, did you know anything about those rocks being there? A. No; I did not know anything about the stones. I never had been there before. * * * Q. Tell us what else happened. A. After that he made the line fast to the pier, then I came to the stern end and threw him another line, and he made that fast to the cleat. Then he pulled on the stern (forward) line, and I pulled on the hinge end. Q. Go on. A. Until she grounded. Then he told me to leave her lay there until to-morrow. * * * Q. Did you pull on her after Elwell left? A. I did not pull any more until the morning; when I got up, I found the boat full of water."

As to the absence of any **orders to** him to pull, the testimony of Andrews was:

"Q. I did not ask you about any orders to pull, I asked you whether, if you had started to pull, you could have done it by yourself. A. I would pull, but I

grounded before I got there. I would pull if there was plenty of water. Q. I did not ask you that. Could you alone have pulled the boat in without anybody helping you? A. Yes; I could pull, if I had orders to pull; but I had no orders, and I stayed there, for nobody don't give me any orders to pull and I stayed right there. Q. I did not ask you that. I do not know whether you and I understand each other. I want to know whether one man alone, like yourself, would have been able to pull that section away from where it was up there down to the wharf? A. If I don't ground I can pull; but the way the rocks were there, no man can pull by himself."

Assuming that the accounts as given by Elwell and Andrews of how and when the grounding of the hinge end on the hump near shore took place are conflicting, we see no reason to disregard the testimony of Boyer, the captain of the Madeline. He appears to be wholly disinterested, is apparently trustworthy, and in the absence of any suggestion by the trial judge, who heard the testimony, as to his interest or credibility, we see no reason to disregard his testimony. That he was present when the barge was moved is clear; that for some reason or other Andrews wanted to get and tried to get the hinge end of the barge in close to the wharf is also clear. While there is a difference in time as to when Andrews pulled that end in toward the wharf, Boyer saying it was after, while Andrews says it was before, Elwell left, it must not be overlooked that there is no question of the fact that it was Andrews who pulled that end in toward the wharf. On that point the testimony of Andrews is:

"Q. Then, when Elwell got the line, he walked up toward the derrick; is that right? A. Yes, sir. Q. That is right? A. Yes, sir. Q. And he was pulling up toward the derrick, and you were pulling in toward the wharf? Is that right? A. Yes, sir. * * * Q. At the time you started pulling there, did you know anything about these rocks being there? A. No; I did not know anything about the stones. I never had been there before."

It is quite clear that this pulling of Andrews, which was done in the dark, and the effect of which Elwell would not see, tended to pull Andrews' end in toward the notch or angle made by the angle of the projection, for the line which Andrews pulled was fastened to at that angle. In that regard Andrews testified:

"Q. Where did he [Elwell] make the hinge end fast? A. On some cleat on the dock in the corner. Q. He made the line fast on a cleat in the corner? A. Yes. Q. In the corner of the two sections? A. Yes, sir. * * * After I unhinged my boat, I started to pull on the hinge line. Q. You started to pull on that hinge line? A. Yes, sir. * * * Q. How did the barge come? Did the barge come ahead, or come sideways? A. It kept coming sideways and ahead, too. Q. The barge kept coming ahead, and kept coming sideways? A. Yes. Q. You kept coming ahead, and coming sideways, until your stern grounded? A. Yes, sir."

Taking Andrews' own story, it was his own sideways pulling, and that into water he did not know, that brought the hinge end into the corner and on the projection which caused her to strain or break. Moreover, while Andrews, when called in rebuttal, testified that he did not pull the hinge end after Elwell left, and in that regard contradicted Boyer, yet when called earlier it is to be noted that he admits that after Elwell left he was pulling on the hinge line, and in that regard confirms Boyer's account. This earlier testimony of Andrews is:

260 F.—24

"Q. Did you pull her in after he left? A. I tried to pull her, but couldn't pull it. It is on the ground. Q. After Mr. Elwell left did you pull on this barge in any way, shape, or form? Did you pull at all? A. I tried to move her then, but I cannot move it any more. * * * Q. How did you try to move her? Which direction? A. I tried to move her. I tried, because I thought there would be some danger, but I cannot go out. * * * Q. You tried to move her so she would come into the dock? A. Yes, sir. Q. How did you try to move her? Did you put the line on the capstan? A. Yes; I just pulled it. I pulled it. I cannot do nothing. I tried to pull it with my arm. Then I made it fast. I first tried to pull it. * * * Q. Then, when Boyer came there, and told you it was a bad place to lay, was that before you tried to move out? A. That is what I tell you; I cannot remember right. I don't remember if it was before or after."

When we add to this variance in Andrews' testimony the fact that Elwell had no object in pulling the hinge end of the barge into the angle made by the projection and the wharf, but was trying to pull it in the direction of the derrick, that Elwell as soon as the barge was sunk, and at all times thereafter, asserted to Tucker that he had left the barge where he now says he did, that Tucker until the filing of the libel never asserted anything to the contrary, we incline to the belief that Andrews' account was an afterthought, and, standing alone, is overborne by the testimony of Elwell and Boyer, and that Tucker has not by the weight of the proof made out a case against Elwell.

Such being our conclusion, the case must be remanded, with directions to dismiss the libel.